**David DUNCAN and wife, Wanda Duncan, Plaintiffs-Appellees, Cross-Appellants,**

v.

**CLAIBORNE COUNTY BANK, Defendant-Appellant.**

Court of Appeals of Tennessee, Eastern Section.

Oct. 25, 1985.

Permission to Appeal Denied by Supreme Court Feb. 24, 1986.

John M. Neal, Morton, Lewis, King & Krieg, Knoxville, for defendant-appellant.

David H. Stanifer, Stanifer & Stanifer, Tazewell, for plaintiffs-appellees, cross-appellants.

OPINION

FRANKS, Judge.

In this action, the chancellor awarded plaintiffs judgment for $24,449.00, the amount deposited by defendant in its bank, and any accrued interest on the savings

account. The bank has appealed, insisting plaintiffs had executed agreements with the bank which entitled it to the proceeds of the account.

On March 26, 1981, David and Wanda Duncan executed a deed of trust on a lot located in the Barren Creek Subdivision in Claiborne County, which they owned as tenants by the entirety. The trust deed secured two notes to the defendant with a combined balance of $62,179.60. The trust deed provided, in addition to the stated indebtedness, the instrument would:

> [S]ecure any and all other indebtedness due from First Parties or either of them, whether direct or indirect to said Claiborne County Bank, its successors or assigns up to an amount not exceeding $100,000.00 ... which may be now or hereafter held by, or become due to said Claiborne County Bank within a period of ten years from the date of this instrument.

In 1983, at various times, David Duncan as co-owner of two businesses executed seven promissory notes to Claiborne County Bank and personally guaranteed the debts. The pertinent provision in the notes is:

> *Set Off*—I acknowledge and agree that you may set off all or any part of the note total against any obligation you may have, now or hereafter to pay money to me. This includes
>
> (a) any deposit account balance I have with you whether time, savings, checking or NOW account; and
>
> (b) any money owing to me on an item presented to you or in your possession for collection or exchange; and
>
> (c) a repurchase agreement or any other non-deposit obligation.

The notes further provide the lender could exercise its right to set-off "without prior demand or notice," and if the debtor's right to receive money was "also owned by some other person" the lender's set-off rights extended to that amount which the debtor could withdraw or receive on his own endorsement.

In October, 1984, a collection officer at the bank approached David Duncan and informed of a potential buyer for the Barren Creek property. Without knowing the identity of the buyers the Duncans, after negotiations with the bank, agreed to sell the property for $59,000.00. The bank's officer prepared an option agreement for a consideration of $1,000.00 which the Duncans received. On December 5, 1984, at the closing of the sale arranged by the bank, David Duncan was presented a cashier's check drawn on the bank for $58,000.00.[1] The Duncans signed a warranty deed conveying the property to the purchasers. David Duncan detected an omission in the deed and took the deed from the bank to get it corrected. Before leaving, he endorsed the cashier's check and left it on the bank officer's desk. The deed was corrected in a lawyer's office and, since one of the purchasers, a lawyer, was present, Duncan gave the deed to that purchaser. Duncan returned to the bank the next day but the officer was out of the bank. On December 7, Duncan went to the bank to negotiate the check but was informed by the bank official that the bank would "keep the rest of it." On the same date, after a call from Duncan's attorney, the bank officer opened the disputed savings account in the bank, designated "Claiborne County Bank for David and Wanda Duncan", in the amount of $24,404.49, which was the equity the Duncans had in the Barren Creek property. Apparently, the bank did not process the check until December 10. This action was filed by the Duncans on December 17, 1984, to recover the moneys in the savings account.

The parties place considerable emphasis on the issue of whether the so-called "dragnet clause" contained in the trust deed served as additional security for David Duncan's business debts. Tennessee has long recognized the general validity of "dragnet clauses" in trust deeds. *Wright*

---

1. The check was made payable to David Duncan only, but the bank's representative conceded at trial the wife's name was erroneously omitted from the check.

*v. Lincoln County Bank,* 465 S.W.2d 877 (Tenn.1970); *Atwood v. Brown & Dillon,* 1 Tenn.Cas. (Shann.) 639 (1876); *Goodfriend v. United American Bank,* 637 S.W.2d 870 (Tenn.App.1982); *Murdock Acceptance Corp. v. Jones,* 50 Tenn.App. 431, 362 S.W.2d 266 (1961). The issue, however, is moot, since the evidence does not establish reliance by the bank upon this security in the transaction before the court. Moreover, it satisfied the note secured by the trust deed on its own initiative and there is no evidence the bank has refused to release the trust deed. The evidence establishes that Duncan delivered the warranty deed to one of the purchasers who, in turn, returned the deed to the bank to be notarized and the deed was recorded in the Register of Deeds Office on December 7. In his testimony, the loan officer explained the basis for withholding the Duncan's equity, which he had planned from the inception of his negotiations with the Duncans for the sale:

Q. You had in mind then that you were going after the equity?

A. Through the right of set-off,[2] yes.

The issue thus becomes the extent the bank may exercise its right to set-off under David Duncan's personal guarantees.[3] The evidence adduced at trial does not focus on the transaction involving the cashier's check. David Duncan's testimony indicates he anticipated depositing the check into his checking account and paying the balance owing on the note secured by the trust deed and retaining the equity. In this regard, the loan officer testified:

Q. You heard Mr. Duncan testify that there was an error in the deed. And to correct the error he merely left that check there?

A. The check was left. I don't know if it was on purpose or just—but he came to get the deed straightened out.

The evidence does not establish the check was presented to the bank for negotiation.

The bank officer, however, negotiated the check, satisfied the note secured by the trust deed from the proceeds and, after the controversy arose, placed the balance in the savings account. He explained:

Q. Why didn't you deposit that to his checking account?

A. It was just put into a savings account for them until this litigation is over with.

The relation of banker and depositor is created only with the consent of the owner of the funds deposited or by his later ratification of a deposit transaction. *Gardner v. American Woodmen,* 11 Tenn.App. 52 (1929). In *Winslow v. Harriman Iron Co.,* 42 S.W. 698 (Tenn.Ch.App.1897), a holder of bank stock entrusted it to the cashier of a bank, instructing the cashier to obtain a loan on the stock and remit the proceeds to the holder. At the time of the transaction, the holder was indebted to the bank. After obtaining the loan, the cashier deposited the funds in the bank. On appeal, the court held the cashier "made this deposit with the express purpose of having it subjected to the claim of the Manufacturers' National Bank," *id.,* at 699, and concluded the cashier overstepped his authority. The court further observed the cashier's act amounted to fraud and the bank could not take advantage of a fraudulent act. Moreover, the court noted the same result would follow under another line of analysis:

> The making of a deposit creates the relation of debtor and creditor as between the bank and the depositor.... [I]t also involves an implication that, if the depositor should become indebted to the bank, the bank would have the right to apply the deposit to the indebtedness.... No one can create this relation between the depositor and the bank without authority from the depositor. In such case the person who holds the depositor's money, and so deposits it without authority, is guilty of a conversion of the fund, and

---

2. No provisions in the trust deed give the bank the right of set-off.

3. As of the date the property was sold, the seven notes of Duncan's two businesses were in default.

the bank receiving it is likewise guilty of conversion.... *Id.*, at 699–700.

The chancellor, in his memorandum, emphasized the fact that Duncan did not himself deposit the check, stating:

I don't think the bank can pick up money off the desk not intended for deposit, themselves deposit the money, and then rely upon the right to take deposits for debts. This is not the normal case where a person has a savings account or checking account that gets in default. Under those circumstances, of course, the bank has every right to take those accounts under a self-help theory, but I think the self-help goes too far under these facts.

■ The rationale of *Winslow* supports the chancellor's conclusion. With respect to the cashier's check, David Duncan did not become a "depositor" in a legal sense. When the bank officer took the check which had been left on his desk and negotiated it with the apparent intent to set-off the Duncans' equity against David Duncan's business debt, he over-reached his authority because the bank officer was not authorized to establish a debtor-creditor relationship between the Duncans and the bank. Moreover, there is no indication that the Duncans ever "ratified" the transaction.

■ Finally, the Duncans' ownership in the funds from the sale was as tenants by the entirety and the bank's depositing the funds in an account for the Duncans would not change the nature of their ownership interest. In this regard, a contract establishing a right of set-off against one of the tenants only would not enable the bank to reach the account by set-off. *See Griffin v. Prince,* 632 S.W.2d 532 (Tenn.1982).

We have considered the remaining issues and find them to be without merit.

The judgment of the chancellor is affirmed at the appellant's cost and the cause remanded.

PARROTT, P.J., and GODDARD, J., concur.